**ROTH OFFICE EQUIPMENT CO. v. GALLAGHER.**

Civil Action No. 498.

District Court, S. D. Ohio, W. D.

Sept. 12, 1947.

Pickrel, Schaeffer & Ebeling, of Dayton, Ohio, for plaintiff.

Sewall Key, Acting Asst. Atty. Gen., Andrew D. Sharpe, John E. Garvey, and Ruppert Bingham, Sp. Assts. to Atty. Gen., Ray J. O'Donnell, U.S. Atty., of Columbus, Ohio, and William J. Dammarell, Asst. U. S. Atty., of Cincinnati, Ohio, for defendant.

DRUFFEL, District Judge.

This is an action arising under Sec. 23(a) of the Internal Revenue Code, 26 U.S.C.A. Int. Rev. Code, § 23(a), and laws of the United States of America, in which plaintiff is seeking to recover $27,703.12 claimed to have been paid as income and excess profit taxes unlawfully and erroneously assessed by defendant for the years 1941 and 1942.

The issue in controversy concerns the salary and bonus paid by plaintiff to its three officers, Chas. W. Roth, President, D. B. McConnaughey, Vice President and Sales Manager, and Dayton Storch, Secretary and Treasurer for the years 1941 and 1942.

After an audit by the Revenue Department, the Commissioner on December 18, 1943, made a determination that the compensation paid plaintiff's officers was unreasonable in part, the amounts claimed and paid by plaintiff and the amounts allowed and disallowed by the Commissioner being as follows:

For the year ending June 30, 1941:

|  | Claimed | Allowed | Disallowed |
|---|---|---|---|
| Chas. W. Roth | $24,700.08 | $21,900.08 | $2,800.00 |
| D. B. McConnaughey | 13,681.92 | 12,181.92 | 1,500.00 |
| Dayton Storch | 8,070.00 | 7,170.00 | 900.00 |
|  | $46,452.00 | $41,252.00 | $5,200.00 |

For the year ending June 30, 1942:

|  | Claimed | Allowed | Disallowed |
|---|---|---|---|
| Chas. W. Roth | $45,125.04 | $26,825.04 | $18,300 00 |
| D. B. McConnaughey | 26,176.96 | 15,576.96 | 10,600.00 |
| Dayton Storch | 15,180.00 | 9,080.00 | 6,100.00 |
|  | $86,482.00 | $51,482.00 | $35,000.00 |

Statute and Regulations Involved. Internal Revenue Code:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *."

26 U.S.C.A. Int.Rev.Code, § 23. Treasury Regulations 103, promulgated under the Internal Revenue Code:

"Sec. 19.23(a)—6. Compensation for personal services.—"Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. This test and its practical application may be further stated and illustrated as follows:

"(1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. (a) An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stock holdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * *

"(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like

services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned."

"Sec. 19.23(2)—8. Bonuses to employees.—Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. It is immaterial whether such bonuses are paid in cash or in kind or partly in cash and partly in kind. Donations made to employees and others, which do not have in them the element of compensation or are in excess of reasonable compensation for services, are not deductible from gross income."

To support its contention of the reasonableness of the salaries and bonus, in addition to an agreed stipulation of facts (Ex.A), plaintiff offered testimony of the officers in question and several witnesses experienced in the same type of business. The defendant offered no testimony other than the cross-examination of plaintiff's witnesses.

From the evidence it appears among other things that the plaintiff company, organized in 1925, with its headquarters at Dayton, dealing in office supplies and equipment, normally expanded from year to year, until 1939-1940-1941 when its sales and activities greatly expanded due in large measure to the fact the headquarters of the United States Army Air Corps were established at Dayton, where all purchases were made for that rapidly expanding service, just preceding and during World War II.

The sales transactions of the company were carried on the books under three classifications, regular, brokerage and commission—regular being sales from its own inventory, such sales being entered on the books as sales were made; brokerage, sales made by plaintiff from samples or catalogues, the goods being delivered by the

manufacturer direct to the purchaser and plaintiff being billed for the wholesale price; and commission sales, where the order taken by plaintiff would be transmitted to the supplier, who upon delivery of the goods direct to the purchaser would also bill the purchaser and upon payment would remit a percentage commission to plaintiff, the commission when received, being recorded by plaintiff.

The commission sales accounted for the larger percentage of the business done by plaintiff company during the period in question, and is primarily responsible for the difference of opinion between plaintiff and defendant as to the reasonableness of the salaries and bonus paid the three officers.

The method of doing business under the third classification was substantially as follows: Plaintiff through its salesmen, especially one Klockson, who until his death in 1940 devoted all his time to sales at Patterson and Wright Fields, Army Air Corps headquarters, was in daily contact with the Army's purchasing sections where bids were solicited for items in which plaintiff dealt; plaintiff in turn would contact their suppliers seeking quotations on the Army specifications. When the price was furnished, plaintiff would put in the bids and if awarded the contract, would transmit copies thereof to the supplier who in turn would deliver the goods and when paid send a memo and commission to plaintiff. After Klockson's death, McConnaughey and Roth and other salesmen took over his duties, Roth taking a considerable amount of it. In addition to the airfield sales Mr. Roth generally supervised all other sales at Dayton and other stores at Springfield, Sidney and Middletown.

Storch was in charge of the books and inside work. Plaintiff claims that 80% of all sales for the period were made by the three officers, and McConnaughey testified that he himself made $3,000,000 of the $4,000,000 commission sales handled by plaintiff.

There was ample proof that the three officers worked hard and at longer hours because of the loss of competent help, and also that they were capable, well experienced in their line, in fact expert in this business.

On the other hand the defendant developed through the agreed stipulation of facts and also by cross-examination, among other things that the commission sales of $1,475,667 claimed to have been made by the officers in 1941 and $4,162,651 in 1942, were really an accumulation of sales of those years plus earlier years back to 1939. In other words the sales were made and the personal service actually rendered in previous taxable years, and to suit plaintiff's purpose were all thrown together in 1941 and 1942, and this is so shown by the fact that in plaintiff's income tax return for 1941 and 1942 only the net amount received as commissions is shown and that actually the now claimed commission sales in 1941 and 1942 were a reconstruction of the same to help plaintiff's position after this litigation was commenced. Compare sales by officers from 1937 to 1942 (Pl. Ex.L).

In addition to the foregoing, while it also appeared from the minutes of the board of directors that the board "may declare a bonus," the facts were that the board at no time declared a bonus, but Roth, McConnaughey, and Storch would get together and determine how much profit they had on hand from time to time and would thereupon declare a bonus.

Counsel for plaintiff has offered many authorities, but upon analysis it will appear they have no relation to the facts in the instant case.

The evidence shows that during the year ending June 30, 1940, out of 525 outstanding shares of taxpayer's stock Mr. Roth owned 364 shares, Mrs. Roth owned five shares, Mr. McConnaughey owned 100 shares and Mr. Storch owned 50 shares, a total owned by the aforementioned persons of 519 shares. Out of 600 shares outstanding on June 30, 1941, the same persons owned the same number of shares. Out of 995 shares outstanding on June 30, 1942, Mr. Roth owned 584 shares, Mrs. Roth owned five shares, Mr. McConnaughey owned 165 shares and Mr. Storch owned 85 shares, a total owned by the aforementioned persons of 839 shares.

■ Counsel for plaintiff attempted to show that the much larger amount claimed by Roth, President, was not by reason of his much larger stock holding but by reason of his greater efforts, etc., in producing commission sales of $1,475,667 in 1941 and $4,162,651 in 1942. These figures were used by counsel as a basis on which he proffered that his expert witnesses would answer "yes" as to whether or not the amounts claimed were reasonable. Since the burden of proof is on plaintiff to establish its case, a number of inconsistencies immediately appear which seem to disprove rather than prove plaintiff's claim.

Mr. Roth testified on direct examination that "the greatest portion of the commission sales were secured before the declaration of war in December, 1941" (Record, P. 34), which would practically dispose of plaintiff's claim of $4,162,651 commission sales in 1942. (Section 23—Deductions for Personal Services Rendered in Taxable Years.)

Salesman Klockson, who until his death in 1940 devoted all his time to sales at Wright and Patterson Fields, Army Air Headquarters, on basis of Roth's testimony, was entitled to some credit for a large proportion of the sales for which Roth now claims credit.

McConnaughey testified that he, himself, made $3,000,000 of the $4,000,000 commission sales handled by plaintiff. Roth was in the courtroom when McConnaughey so testified, and made no effort to explain or amplify his previous testimony. So we must accept McConnaughey's testimony as true. So, if the bonus was paid on the basis of "personal services actually rendered" (Sec. 19.23(a)—6), there would be little room for Roth's claim, considering what Klockson and McConnaughey actually sold.

It would appear further that not only has plaintiff failed to prove the accuracy of the claimed commission sales in 1941 and 1942, but that consideration of plaintiff's income tax returns in which they merely set up certain sums received on commission sales would tend to disprove plaintiff's claims.

Keeping in mind Roth's testimony that the greater portion of the commission sales were made before the declaration of war in 1941, there was justification for the claimed increase in 1941, for the reason that some orders taken prior thereto were probably filled in 1941, and the income was modest in comparison with that of 1942.

On the whole it would appear that the so-called bonus was really "a distribution of a dividend on stock" (Sec. 19.23(a)—6). Record, page 95:

"Mr. Bingham: Q. Then these bonuses really represented a return of your capital?

"Mr. McConnaughey: A. I don't know if you would call it a return of capital; it was just simply, we were like any other firm, we began to make a little money; at least, the persons ought to have the money, who have the money invested and are doing the work; that's the way we did, and when things were different, we just cut our salaries.

"Mr. Bingham: Q. Then your answer is, because of your investment and the fact that you were working there and had the stock ownership, it meant that you would get the bonus?

"Mr. McConnaughey: A. That's right."

This testimony clearly tells the story. Recalling that the minutes state, the board may declare a bonus, the board as a matter of fact never declared a bonus, but it was always worked out by Roth, McConnaughey and Storch. And the further fact that McConnaughey, in view of his testimony that he made $3,000,000 out of the claimed $4,000,000 commission sales, agreed to Roth receiving a much larger bonus than the others, is convincing evidence that he recognized and agreed that Roth was entitled to a much larger bonus because of his larger stockholdings.

■ After consideration of all the testimony, and giving plaintiff's evidence the most favorable interpretation including the extra services rendered and higher cost of living, this court made a separate findings of fact and conclusions of law, that plaintiff has sustained the burden of proof in establishing that the salaries and bonus claimed by Roth, McConnaughey, and Storch for the year ending June 30, 1941, were reasonable and that plaintiff has sustained the

burden of proof for the year ending June 30, 1942, as to Roth $35,000, McConnaughey $20,000, and Storch $12,500 and has failed to sustain the burden as to the balance claimed.